**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **ASSOCIATED PROFESSIONAL EDUCATORS OF LOUISIANA** | **CASE NO. 1:22-CV-05720** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **E D U 20/20 L L C ET AL** | **MAGISTRATE JUDGE PEREZ-MONTES** |

# MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment on all claims [Doc. No. 143] filed by Defendants, EDU20/20, Courtney Dumas ("Dumas"), and Miranda Britt ("Britt") (collectively, "Defendants"). Also before the Court is a Motion for Partial Summary Judgment on liability under the Lanham Act [Doc. No. 151], filed by Plaintiff, Associated Professional Educators of Louisiana ("A+PEL") ("Plaintiff"). Both Motions are opposed.

After careful consideration of the parties' memoranda and the applicable law, the first Motion [Doc. No. 143] is **GRANTED IN PART** and **DENIED IN PART**, and the second Motion [Doc. No. 151] is **GRANTED.**

## I. Background

This dispute comes before the Court after a long and winding road. Indeed, the factual background originates in 1984 when Plaintiff began operating under the tradename "A+PEL" (pronounced as "apple").[1] Operating under this tradename, A+PEL developed a number of training and certification programs that it marketed

[1] [Doc. No. 41, ¶ 18.12].

and sold to school districts and teaching professionals.[2] Over the years, the organization developed an expansive network of connections with local school districts and a database of "members" to which it solicited its courses and information relevant to its mission.[3] In 2013, A+PEL developed its logo, displayed below, and has used it continuously since.[4]

a+pel
Associated Professional
Educators of Louisiana

In the summer of 2014, A+PEL hired Britt as one of five full-time employees.[5] As Director of Professional Development and University Programming, Britt developed and marketed A+PEL's training and certification programs.[6] This involved, among other things, fostering goodwill with school districts and state education administrators, as well as representing A+PEL at conferences.[7]

---

[2] [Id. at ¶ 7].
[3] [Id. at ¶¶ 18.5, 18.7].
[4] [Id. at ¶ 18.3].
[5] [Id. at ¶ 20].
[6] [Id. at ¶¶ 20–21].
[7] [Id. at ¶ 21].

On March 16, 2015, Dumas and Britt formed EDU20/20, a private limited liability company providing consulting services, teacher training, and teacher coaching to school districts and teachers.[8] At the time, both Britt and Dumas were member-managers of the EDU20/20, and each owned half of the business.[9] Britt served as EDU20/20's Senior Director of Partnerships.[10] Put simply, Britt, as an employee of A+PEL, co-founded and co-operated an organization with a similar mission and business focus. After registration with the Louisiana Department of Education ("LDOE"), EDU20/20 would compete with A+PEL for contracts with local school districts.[11]

In February of 2016, Britt was promoted to Deputy Director of A+PEL—a position which added to her previous responsibilities the role of serving as second-in-command to Executive Director Dr. Keith Courville ("Courville").[12]

Britt seemed to navigate the dual roles without conflict until fall of 2020 when EDU20/20's business began in earnest. In September of 2020, EDU20/20 applied to the LDOE to become an approved professional development vendor in the state.[13] In its application, EDU20/20 stated, "Edu20/20 has two full-time Louisiana-based staff members" which included Britt and Dumas.[14] Defendants later admitted that this was a lie to secure approval from the state, but it shows the extent of her involvement

[8] [Doc. No. 86-1, p. 1]; [Doc. No. 41, ¶ 28].
[9] [Doc. No. 79-5, p. 6].
[10] [Doc. No. 79-5, p. 48].
[11] [Doc. 79-5, p. 34].
[12] [Doc. No. 41, ¶¶ 22–23]; [Doc. No. 48, ¶ 29].
[13] [Doc. No. 99-2, p. 6]; [Doc. No. 41, ¶ 29]; [Doc. No. 48, ¶ 29].
[14] [Doc. No. 82-1, p. 12].

in getting EDU20/20 off the ground.[15] In January of 2021, EDU20/20 added Shannon Streett ("Streett") as a third member-manager, with each owning one-third share of the business.[16]

It was during this time—the summer and fall of 2021—that the events leading to the dissolution of Britt's relationship with A+PEL primarily took place. In the fall of 2021, A+PEL secured "the largest instruction coaching contract [it] had ever obtained" requiring Britt who up until this point had worked for home to work on-site at A+PEL for ninety days.[17] Shortly thereafter, Britt gave her notice of resignation.[18] Britt worked at A+PEL through the end of the year and continued on a contract basis through March of the following year.[19] It was at this point that Courville discovered the extent of Britt's involvement with EDU20/20 and permanently severed A+PEL's relationship with Britt.[20]

A+PEL initiated a lawsuit in October of 2022 against Britt, Dumas, and EDU20/20 alleging violations of the Federal Defend Trade Secrets Act ("DTSA"), the Louisiana Uniform Trade Secrets Act ("LUTSA"), the Louisiana Unfair Trade Practices Act ("LUTPA"), and Civil Conspiracy.[21] It also brought a Breach of Fiduciary Duty action against only Britt.[22] After a year and a half of discovery,

15 [Doc. No. 79-18, p. 14].
16 [Doc. No. 41 ¶ 30].
17 [Doc. No. 41, ¶ 55].
18 [Id. at ¶56]; [Doc. No. 79-1, p. 4].
19 [Doc. No. 41, ¶ 66]; [Doc. No. 48, ¶ 66].
20 [Doc. No. 79-3, p. 3].
21 [Doc. No. 1].
22 [Id. pp. 22–23].

Plaintiff added an additional claim against all Defendants for violation of the Lanham Act.[23]

After a number of cross-motions for partial summary judgment on all the claims, this Court denied A+PEL's motions and granted Defendants' motion for summary judgment on the two claims supplying federal question jurisdiction: the Lanham Act and DTSA claims. *Associated Prof. Educators of Louisiana v. EDU20/20 LLC*, No. 1:22-cv-05720, 2024 WL 4363258 (W.D. La. Sep. 30, 2024). This Court also dismissed Plaintiff's LUTSA claim and the LUTPA and breach of fiduciary duty claims that related to the use of A+PEL's logo and confidential information. *Id.* at *6. This Court then declined to exercise supplemental jurisdiction over the remaining state law claims. *Id.*

On appeal, the Fifth Circuit affirmed this Court's grant of summary judgment on the trade secrets claims (i.e., DTSA and LUTSA) but vacated this Court's dismissal of the Lanham Act claim, resupplying federal question jurisdiction and, by extension, supplemental jurisdiction on the now-remanded state law claims. *Associated Prof. Educators of Louisiana v. EDU20/20 L.L.C.*, No. 24-30640, 2026 WL 448019 (5th Cir. Feb. 16, 2026). More specifically, the Fifth Circuit found that a genuine issue of material fact existed as to whether Britt's use of the A+PEL logo created a "likelihood of confusion" in the minds of potential customers as to Britt's affiliation with A+PEL and EDU20/20, and as to the relationship between the two organizations. *Id.* at *6.

[23] [Doc. No. 39]; [Doc. No. 41].

At this juncture, the dispute may be bifurcated into matters relating to Britt's use of the A+PEL logo and those relating to the alleged diversion of customers. With respect to the former, both sides agree that Britt displayed the A+PEL logo along with the EDU20/20 logo in four presentations: (1) "Tighten Up Your Saggy PLCs" ("Saggy PLCs") at the Teacher Leader Summit ("TLS"),[24] (2) "Clean Up Your Mouth-Getting Rid of the F Word in ELA" ("Clean Up Your Mouth") at the TLS,[25] (3) a presentation at the Catahoula Leadership Academy;[26] and (4) a presentation at the Catahoula Parish School District's "Catahoula Forward Rapides Retreat".[27] In each presentation except for "Clean Up Your Mouth," the A+PEL logo was placed next to the EDU20/20 logo. In all the presentations the logo was used on one "biographical" slide in the beginning of the presentation.[28] With respect to customer diversion, Plaintiff points to four parties whose business was potentially diverted from A+PEL to EDU20/20 by Defendants: The West Feliciana Parish School District ("West Feliciana"),[29] the Washington Parish School District ("Washington"),[30] the West Baton Rouge Parish School District ("West Baton Rouge"),[31] and Rachel Bunch from LDOE ("Bunch").[32]

There are four claims pending before the Court. The first claim, Plaintiff's claim for unfair competition and trademark infringement under the Lanham Act,

---

[24] [Doc. No. 85-6, p. 2].
[25] [Doc. No. 95-10, p. 6].
[26] [Doc. No. 85-8, p. 3].
[27] [Doc. No. 85-9, p. 4].
[28] [Doc. No. 99, p. 7].
[29] [Doc. No. 79-5, p. 53].
[30] [Doc. No. 149-1, pp. 3–4].
[31] [Id. at p. 6].
[32] [Doc. No. 79-5, pp. 50–52].

relates to Defendants' use of A+PEL's logo on those four occasions. The remaining three claims—arising under LUTPA, Civil Conspiracy, and the Fiduciary Duties Britt owed to A+PEL—relate to Defendants' alleged diversion of customers from A+PEL to EDU20/20. Defendants seek summary judgment on each.[33] Plaintiff moves for partial summary judgment with respect to liability on its Lanham Act claim.[34]

## II. Legal Standard

Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *In re Genesis Marine*, LLC, 164 F.4th 448, 453 (5th Cir. 2026) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute about a material fact "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). Put differently, courts must grant summary judgment against a party who does not—or cannot—show "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The movant must first point to "particular parts of materials in the record," such as depositions, documents, electronic information, affidavits, interrogatories, etc., to show there is no genuine dispute of material fact. FED. R. CIV. P. 56(c)(1)(A).

[33] [Doc. No. 143].
[34] [Doc. No. 149].

Once the movant does so, the burden shifts to the nonmovant who "must go beyond his pleadings and designate specific facts showing that there is a genuine dispute of material fact for trial." *Clark v. Dep't of Pub. Safety & Corr.*, 141 F.4th 653, 659 (5th Cir. 2025) (citing *Celotex*, 477 U.S. at 324)). The nonmovant cannot "defeat summary judgment with" metaphysical doubts as to the facts, "'conclusory allegations,' 'unsubstantiated assertions,' or 'only a scintilla of evidence.'" *In re Genesis Marine*, 164 F.4th at 453 (collecting cases).

Finally—and most importantly—when resolving summary judgment motions, "courts may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes" and must resolve all ambiguities and draw all permissible inferences "in favor of the non-moving party." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (citation modified) (citing *Anderson*, 477 U.S. at 255).

## III. Law and Analysis

### A. Lanham Act

#### 1. Liability

Enacted 80 years ago, the Lanham Act was intended "to protect registered marks" "by making actionable the deceptive and misleading use of marks." 15 U.S.C. § 1127. It does so by creating a federal cause of action for trademark infringement. In the ordinary case, the owner of a mark sues a competitor using a mark that closely resembles its own. The court must then decide whether the defendant's use is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §§ 1114(1)(A), 1125(a)(1)(A).

To recover on a claim of trademark infringement, a plaintiff must establish both an "ownership in a legally protectible mark," and infringement based on "a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue." *Bd. Of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474, 478 (5th Cir. 2008) (cleaned up). A mark need not be registered to obtain protection as "[o]wnership of trademarks is established by use, not by registration." *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 843 (5th Cir. 1990). Here, the parties dispute only the second prong.

To determine whether a likelihood of confusion exists, courts are instructed to consider the following non-exhaustive list of eight factors or "digits of confusion":

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[, and] (8) the degree of care exercised by potential purchasers.

*Smack Apparel Co.*, 550 F.3d at 478.

As the Fifth Circuit has repeatedly clarified, "[l]ikelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 663–64 (5th Cir. 2000); *see also Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).

### i. The Type of Mark Allegedly Infringed

The type-of-mark digit refers to the strength of a mark: "Strong marks receive 'the widest ambit of protection,' and weak marks do not." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020) (quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)). The Fifth Circuit uses the *Abercrombie* factors in determining the relative strength of a particular trademark. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). A mark's strength is assessed on a spectrum of five categories: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Streamline Prod. Sys, v. Streamline Mfg., Inc.*, 851 F.3d 440, 451 (5th Cir. 2017). "[T]he strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Am. Rice, Inc. v. Producers Rice Mill. Inc.*, 518 F.3d 321, 330 (5th Cir. 2008) *(cleaned up).* Classification of a mark is a question of fact.

Plaintiff argues that its logo is "not generic or descriptive" but is a "fanciful, arbitrary mark."[35] Defendants argue that the "evidence on the record does not . . . resolve the mark's alleged strength."[36]

Plaintiff's mark does not neatly fit into a particular category. At the outset, it is clear that it is not arbitrary or generic. It is likely not fanciful; though clever, the logo includes the name "A+PEL" which is, at its core, an acronym and an apple, a symbol commonly associated with education. There are good arguments for each of the remaining two categories: suggestive and descriptive. The Plaintiff's name,

[35] [Doc. No. 151-1, pp. 13–14].
[36] [Doc. No. 155, p. 9].

"A+PEL," is a stylized acronym that both evokes "A+"—the highest grade—and is pronounced "apple," a symbol widely associated with education. This creative, idiosyncratic acronym requires the viewer to make a mental step to associate it with education—a hallmark of a suggestive mark. At the same time, many organizations associated with education use an apple and "A+PEL" is simply an acronym for "Associated Professional Educators of Louisiana"—both facts which cut towards it being a descriptive mark. Nonetheless, the mark is on the stronger side. This factor cuts toward a likelihood of confusion.

**ii. The Similarity Between the Two Marks**

Defendants admit that "Britt used A+PEL's actual logo."[37] In refuting this digit, they point to the underlying purposes of the Lanham Act, arguing that it "is concerned with confusion" and that "[n]o reasonable presentation attendee (or jury) would conclude anything more than that Britt's biographical slide was a visual resume."[38] Plaintiff argues that the placement of its logo next to EDU20/20 as well as the similar color scheme furthers the likelihood of confusion.[39]

This factor supports a likelihood of confusion. Defendants posit that the reasonable observer would understand the presentation of the logo to be part of a "visual resume."[40] For its part, Plaintiff does not contest that the biographical slide's purpose is something like that of a resume.[41] Plaintiff's argument is that the

[37] [Id. at p. 10].
[38] [Id.].
[39] [Doc. No. 151-1, p. 20].
[40] [Doc. No. 155, p. 10].
[41] [Doc. No. 151-1, p. 20].

reasonable observer would be confused as to the connection between A+PEL, EDU20/20, and Britt.[42] It argues that the use of the logo created the false impression that A+PEL was associated with EDU20/20 or endorsed the organization.[43] The fact that an observer or a jury would understand the slide to be a resume does not reduce this confusion; indeed, it likely *increases* the confusion as the context explicitly evokes concepts of organizational affiliation which is at the heart of this dispute. In the end, the fact remains that Britt used the *exact* mark owned by A+PEL. Moreover, the contextual factors—the fact that the slide was a biographical slide, its placement next to the EDU20/20 logo, etc.—do not favor Defendants. Instead, Defendants rely on arguments regarding intent and actual confusion. These digits are not considered here. As such, this factor favors Plaintiff.

**iii. The Similarity of the Products or Services**

"The greater the similarity between products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,* 628 F.2d 500, 505 (5th Cir. 1980). "Direct competition between the parties' services or products is not required in order to find a likelihood of confusion." *Professional Golfers Ass'n of Am. v. Bankers Life & Cas. Co.,* 514 F.2d 665, 669–70 (5th Cir.1975).

The dispute over the similarity of services is essentially a dispute over the appropriate level of generality to make the comparison. Defendants posit a very narrow level of generality arguing that while both organizations "provide professional

[42] [Id.].
[43] [Id.].

development services to educators, they did not do so 'in the same manner.'"[44] At a higher level of generality, Plaintiff argues that "A+PEL and EDU20/20 provide the same services" as both are educational support organizations who train teachers and school administrators.[45]

There is no talismanic solution to the level-of-generality problem, and the issue vexes courts in a variety of contexts.[46] That being said, the issue is not intractable, and multiple factors tend toward A+PEL. First, while direct competition is not required, it is undisputed that both A+PEL and EDU20/20 provide, among other things, professional development services for educators in Louisiana. Second, contrary to what the Defendants urge, the services do not have to be provided "in the same manner" for the parties or provide similar services for purposes of this digit.[47] For example, in *Exxon Corp.*, the Fifth Circuit found that Exxon, a supplier of a "wide range of petroleum products" was sufficiently similar to an automotive repair service because both are "involved in car care." *Exxon Corp.*, 628 F.2d at 505. While the "manner" with which Exxon and the autobody shop provided its services was different, the court found that there was a "strong similarity" in their services. *Id.* Relatedly, the Fifth Circuit has never required that the parties occupy the same market. The court clarified that "[t]he danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the

---

[44] [Doc. No. 155, p. 10].
[45] [Doc. No. 151-1, p. 14].
[46] *See e.g.*, Sherif Girgis, *Unfinished Liberties, Inevitable Balancing*, 125 COLUM. L. REV. 531, 563 (2025).
[47] [Doc. No. 155, p. 10].

senior user would naturally expand." *Capece*, 141 F.3d at 202. In sum, this Court finds that the third digit also tends toward a likelihood of confusion.

**iv. The Identity of the Retail Outlets and Purchasers**

Plaintiff argues that both organizations "marketed their services to the same consumers: educators, schools, and school districts."[48] Defendants retort, "A+PEL's evidence establishes only that the two organizations presented at the same conference and marketed generally to Louisiana school districts."[49] Though styled as a rejoinder, this is a concession. This digit does not require the parties to target the exact same consumers; rather, it looks to the general category that the parties' patrons fit within. In *Sun Banks*, the Fifth Circuit asked whether the parties were "capable of attracting similar customers." *Sun Banks*, 651 F.2d 311at 318. Even if the parties were targeting different school districts, the *type* of consumer—that is, school districts in Louisiana—is identical. This analysis is similar to the previous digit as the "identity of customers . . . is largely the result of comparable services offered." *Id.* at 318. This digit also supports a likelihood of confusion.

**v. The Identity of the Advertising Media Used**

Plaintiff points out that "A+PEL and EDU20/20 used the same advertising media—presentations during the 2021 Teacher Leader Summit."[50] Defendants acknowledge that this is "undisputed" but argue that "standing alone, it is not evidence that any confusion actually resulted or would have been likely to result."[51]

---

[48] [Doc. 151-1, p. 15].
[49] [Doc. 155, p. 12].
[50] [Doc. 151-1, p. 15].
[51] [Doc. 155, p. 12].

Defendants' view, though true, is at tension with the nature of multi-factor tests. As noted, no digit is dispositive. Rather, the Court proceeds through each digit and then proceeds to "weigh those digits" "depending on the particular facts and circumstances involved." *Capece*, 141 F.3d at 194; *Streamline*, 851 F.3d at 453 (cleaned up). Defendants' argument regarding actual confusion will be discussed in the seventh digit. The fifth digit supports likelihood of confusion.

**vi. The Defendant's Intent**

The sixth digit—bad intent—is "not necessary" but "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Streamline*, 851 F.3d at 455 (cleaned up); *Future Proof*, 982 F.3d at 289. The Fifth Circuit has explained that the "intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline*, 851 F.3d at 455. "Mere awareness" of the senior user's mark does not establish "bad intent." *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985). In summarizing Fifth Circuit cases, the court stated, "[w]e have found an intent to confuse when the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity." *Streamline*, 851 F.3d at 456.

Plaintiff points to a few pieces of evidence to suggest Defendants' bad intent. First, they note that Dumas and Streett's biographical slide did not list the logo of their previous employer, Instruction Partners, suggesting that there was a particular association that Britt sought to generate between A+PEL and EDU20/20.[52] Second,

[52] [Doc. 151-1, p. 16].

they emphasize that Britt used the logo to draw a connection to A+PEL.[53] Finally, they once more emphasize the proximity of the A+PEL and EDU20/20 logos in the biographical slide. Defendants reject the notion that there is anything untoward in Britt's use of the logo to draw a connection with her current employer. They argue that Britt had a "good-faith belief that she had permission to use the logo to identify her actual, undisputed employer."[54]

The fact-intensive nature of this digit coupled with the disputed facts between the parties makes determination by this Court improper at the summary judgment stage. There is a genuine dispute of material fact as to Defendants' motive in using the logo. A reasonable jury could find that it was Britt's intent to foster an association between A+PEL, an established educational services provider, and EDU20/20, a budding organization in the same field. A reasonable jury could likewise find her use of the logo innocent—merely a marker of her undisputed association with A+PEL.

**vii. Any Evidence of Actual Confusion**

Much ink has been spilled in this case on this digit—and, for good reason. For one, actual confusion constitutes the "best evidence of a likelihood of confusion." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 197 (5th Cir. 2018) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 226 (5th Cir. 2009)). For another, it requires careful scrutiny of the factual record. Plaintiff highlights the declaration of Dr. Tia Neal who attended two presentations by Britt wherein Britt

---

[53] [Id. at pp. 15–16].
[54] [Doc. No. 155, p. 13].

used both the A+PEL and EDU20/20 logos.[55] She said, "I assumed that there was an association and/or affiliation between A+PEL and EDU20/20."[56] Likewise, Plaintiff offered the declaration of Torrence Williams who attended a presentation by Britt on behalf of EDU20/20. He similarly "assumed that A+PEL endorsed the presentation."[57] Finally, Plaintiff points to an email from Rachel Bunch, an LDOE representative, who emailed Britt at her A+PEL email address after the Saggy PLCs presentation at the TLS asking for more information about training,[58] as well as a conversation with the superintendent of the West Feliciana Parish Schools along similar lines.[59]

For their part, Defendants argue that even if there was evidence of actual confusion as to the relationship of A+PEL, EDU20/20, and Britt, it is not evident that the logo, as opposed to Britt's employment with both organizations, caused the confusion.[60] Further, they contend that a jury is best fit to make a credibility determination regarding the testimony given the fact that both declarants currently work for A+PEL and there was a three-year gap between the presentations and their testimony.[61]

This Court finds sufficient evidence of actual confusion that resulted from Defendants' use of A+PEL's logo. When considering whether there was enough evidence of actual confusion, Judge Oldham concisely answered: "[the] answer is

[55] [Doc. No. 151-1, p. 18].
[56] [Doc. No. 82-8, pp. 1–2].
[57] [Doc. No. 79-22, pp. 1–2].
[58] [Doc. No. 131, pp. 15–16].
[59] [Doc. No. 79-5, p. 53].
[60] [Doc. No. 155, pp. 14–20].
[61] [Id.].

obviously yes—because it submitted declarations from two people who *were actually confused about Britt's affiliation with A+PEL*." *Associated Prof. Educators of Louisiana*, 2026 WL 448019, at *12 (Oldham, J., concurring). If the two declarants are not enough, the business interest from Bunch, which was explicitly targeted at A+PEL, and the superintendent of the West Feliciana Parish Schools (a then-client of A+PEL) is further evidence of actual confusion as the Fifth Circuit has long held that misdirected inbound inquiries are "indicia of actual confusion." *Oreck Corp. v. U.S. Floor Sys.*, 803 F.2d 166, 173 (5th Cir. 1986).

**viii. The Degree of Care Exercised by Potential Purchasers**

The final digit—the degree of care likely to be exercised by purchasers—is often determined with reference to the price of the product or service and the level of sophistication of customers. The general rule is that where items are expensive and buyers are sophisticated, confusion is less likely. *Smack Apparel Co.*, 550 F.3d at 483 ("Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." (citing *Sun-Fun Prods., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 191 (5th Cir. 1981))). "However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar." *Xtreme Lashes*, 576 F.3d at 231 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595–96 (5th Cir. 1985)).

Tending against likelihood of confusion, the Fifth Circuit has recognized that school districts are "sophisticated institutional purchasers that are not easily confused." *Springboards to Education, Inc. v. Houston Ind. Sch. Dist.*, 912 F.3d 805,

817 (5th Cir. 2019). Moreover, the contracts that both organizations make with their customers can be substantial. Tending toward likelihood of confusion is the Fifth Circuit's most recent case on point, *Trojan Battery*. *Trojan Battery Co., L.L.C. v. Golf Carts of Cypress, L.L.C.*, 175 F.4th 582 (5th Cir. 2026). In that case, the relevant products were expensive, but evidence of actual confusion among sophisticated customers was enough for the factor to weigh in favor of a likelihood of confusion. *Id.* at 598–99. Here, two individuals familiar with educational professional development in Louisiana were actually confused. *See supra*. The evidence of actual confusion among sophisticated individuals and the precedential weight of *Trojan Battery* resolves this digit in favor of a likelihood of confusion.

**ix. Permission and Nominative Fair Use**

In their opposition to Plaintiff's partial summary judgment, Defendants propose two additional digits for consideration: permission and nominative fair use.[62] With respect to the former, Defendants argue that the lack of an explicit policy regarding logo usage is "strong evidence that A+PEL did not identify any likelihood of confusion that could arise from truthful logo usage in presentations."[63] With respect to the latter, Defendants argue that Britt's logo use was simply "[a] truthful representation of an actual employment relationship."[64] The Court rejects these blinkered arguments.

[62] [Doc. No. 155, pp. 20–22].
[63] [Id. at p. 21].
[64] [Id. at p. 22].

Defendants note that "A+PEL had no written policy prohibiting employees form using the A+PEL logo."[65] Of course not. In many cases, A+PEL likely would, at the very least, encourage use of their logo when their employees presented on behalf of the organization. The issue was not merely, as Defendants suggest, the use of the logo. If Britt had no relation to EDU20/20, did not place the EDU20/20 logo and the A+PEL logo next to each other, was not with Dumas and Streett, and clearly presented on behalf of A+PEL, there would likely be no lawsuit. But analysis under the Lanham Act is necessarily context dependent. These factors—which Defendants elide—are critical to assessing whether there was permission. Whether the same person using the same logo has or lacks permission depends on factors such as association with competitors, the images around the logo, one's association with the markholder when presenting, etc. If John Francis Dodge (co-founder of Dodge Brothers) used the Ford logo in a presentation in 1913 when he was Vice President of the Ford Motor Company, he would likely have permission from Henry Ford. If the same presentation occurred a year later when Dodge Brothers was up-and-running, he would likely not have permission from Henry Ford.

To the extent that Defendants' argument would impose upon employers the duty of possessing an explicit policy forbidding conduct that later is the source of a lawsuit, the Court rejects that argument. Such an imposition would force employers to establish a byzantine set of rules regarding use of its intellectual property. This duty also belies the nature of adjudication, which is necessarily *ex post* and would

---

[65] [Id. at p. 21].

impose upon plaintiffs the burdensome requirement of forbidding *ex ante* what is only clear *ex post*. The Court will not engage in "this sort of Monday morning quarterbacking." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 547 (1978). In fact, it is not clear what policy A+PEL should have articulated. As noted previously, it likely encouraged its employees to use its logo when presenting. At the same time, it would forbid employees who are surreptitiously working for a competing organization to use its logo when presenting in a manner where it's not clear who they are presenting on behalf of. Such a rule would be comically specific.

Defendants' nominative fair use arguments do not fare much better and much of the previous analysis applies with equal force here. Both parties cite the Fifth Circuit's line in *Scott Fetzer*: "Independent dealers and repair shops may use a mark to advertise truthfully that they sell or repair certain branded products so long as the advertisement does not suggest affiliation or endorsement by the markholder."[66] *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484 (5th Cir. 2004). The Defendants explain "Britt's identification of her actual, undisputed employment with A+PEL on a biographical slide is a truthful reference to a real relationship, not an attempt to trade on an affiliation that did not exist."[67] However, as Plaintiff notes in its reply, A+PEL's objection is not that the logo falsely created an association between Britt and A+PEL; Plaintiff concedes such an association existed at the time of the presentation. Rather, the concern was that the logo use "implie[d] an affiliation

---

[66] [Doc. No. 156, p. 7]; [Doc No. 155, p. 22].
[67] [Doc. No. 155, p. 13].

between A+PEL and EDU20/20," which would not be a "truthful reference to a real relationship."[68]

Defendants press another argument, analogizing the case to *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002).[69] In fact, *Welles* cuts against their argument. In that case from 2002, the defendant, Terri Welles, was the "Playboy Playmate of the Year for 1981." *Welles*, 279 F.3d at 803. In the years leading up to the lawsuit, she referred to herself as the "Playboy Playmate of the Year for 1981" on her personal website, giving rise to the trademark infringement claim by Playboy. *Id.* at 800.

In its discussion of nominative fair use, the court drew an analogy to the Chicago Bulls which is invoked in Defendants' brief. The court stated: "It would be unreasonable to assume that the Chicago Bulls sponsored a website of Michael Jordan's simply because his name appeared with the appellation 'former Chicago Bull.'" *Id.* at 803. This analogy was used to show that the specification that Welles was "Playboy Playmate of the Year *in 1981*" "function[ed] as the [term] 'former' in [the court's] example. *Id.* at 803 (emphasis added). It shows that any sponsorship or endorsement occurred in the past" and would therefore not lead a reasonable observer to think the association or endorsement was ongoing. *Id.* Defendants gloss this argument from *Playboy* stating, "no one would assume the Chicago Bulls sponsored a website merely because it truthfully described its subject as a 'former Chicago

[68] First quoting [Doc No. 156, p. 8], then quoting [Doc. No. 155, p. 22].
[69] [Doc. No. 155, p. 22].

Bull.'"[70] Critically, the quote states "*former* Chicago Bull." *Id.* (emphasis added). The reason that quote can effectively operate as a *reductio ad absurdum* is because the subject uses the modifier "former." In fact, as shown above, the Ninth Circuit panel used that example to draw out the importance of the fact that the association was no longer ongoing. Consider the following quote without the modifier: "no one would assume the Chicago Bulls sponsored a website merely because it truthfully described its subject as a 'Chicago Bull.'" The argument no longer follows. During the presentations at issue here, Britt was not "former Deputy Director of A+PEL," she was the current Director of A+PEL. Her then-active association with A+PEL not only makes *Welles* disanalogous for Defendants' purposes, but it also makes the exact distinction that the *Welles* court found relevant—namely, *if* Welles was the *current* Playmate of the Year, it would suggest sponsorship or endorsement.

**x. Analysis of the Digits**

After reviewing the record, this Court concludes that there is no genuine issue of fact that Defendants' use of the A+PEL logo created a likelihood of confusion as to the source, affiliation, or sponsorship of the A+PEL logo vis-à-vis EDU20/20 and Britt. "[A] finding of a likelihood of confusion need not be supported by a majority of the [digits]." *Streamline Prod.*, 851 F.3d at 453 (cleaned up). And district courts may weigh those digits "differently from case to case, depending on the particular facts and circumstances involved." *Id.* (cleaned up). Here, a clear majority—seven out of

[70] [Id. at p. 23].

eight—favor Plaintiff.[71] With only the undisputed facts on the record and construing these facts in the light most favorable to Defendants, one digit, Defendants' intent, cannot be resolved in either direction. The Defendants' intent is particularly fact-intensive, resting as it does on determinations that are of the peculiar province of the jury.

Moreover, this factor becomes particularly weighty when there is an intent to confuse as "that alone may be sufficient to justify an inference of a likelihood of confusion." *Capece*, 141 F.3d at 203. The factor is not as important if it is shown to cut against a likelihood of confusion. In other words, the relative importance of the digit is only applicable if there *is* intent to confuse; it is not similarly weighty when there is no such intent or good faith. *Id.* ("If the defendant acted in good faith, then this digit of confusion becomes a nonfactor in the likelihood-of-confusion analysis, rather than weighing in favor of a likelihood of confusion."); *Xtreme Lashes*, 576 F.3d at 229 ("However, with no evidence of Xtended's intent, this factor is neutral."); *Viacom Int'l*, 891 F.3d at 195 ("If there is no evidence of intent to confuse, then this factor is neutral.").[72] Thus, even if this digit were resolved in Defendants' favor, it would not be enough to overcome the combined weight of the other digits that cut toward likelihood of confusion. This is enough to resolve liability on the Lanham Act in favor of Plaintiff. The Court finds that, as a matter of law, Plaintiff satisfies both

[71] If the Court includes the two additional digits proposed by Defendants—permission and nominative fair use—then nine out of ten support Plaintiff.

[72] This argument is not central to this Court's weighing of the factors. The Fifth Circuit recently acknowledged that its "precedent has used inconsistent language" on the weight of intent when there is no bad faith. *Future Proof*, 982 F.3d at 296. That being said, the panel stated that the Fifth Circuit "usually indicate[s] that an absence of intent renders that digit neutral." *Id.*

prongs of the liability determination under the Lanham Act—ownership and likelihood of confusion.

**2. Remedies**

Plaintiff moved only for partial summary judgment on liability under the Lanham Act.[73] Defendants moved for summary judgment on the entire Lanham Act claim.[74] Having found Defendants liable under the Lanham Act, the Court now proceeds to consider Defendants' Motion for Summary Judgment with respect to remedies.

A critical event for the Plaintiff's purported damages occurred in May 2021 at the Teacher Leader Summit. The Summit, an annual professional development conference in New Orleans, "brings together Louisiana educators, superintendents, supervisors, school leaders, and content experts."[75] In January 2021, Britt submitted applications to present on behalf of both A+PEL and EDU20/20. Only the presentation for A+PEL was accepted.[76] Even though A+PEL sent Britt to the conference to present on behalf of A+PEL, Britt admitted that she represented EDU20/20 at the conference, without Courville's knowledge.[77] During the presentation, Britt used the A+PEL logo amidst twelve other images and icons. During the same conference, Britt presented another presentation with Dumas and Streett with the A+PEL logo.

---

[73] [Doc. No. 151].
[74] [Doc. No. 143].
[75] [Doc. No. 79-1, p. 8].
[76] [Doc. No. 95, p. 19 n.10].
[77] [Doc. 79-5, pp. 21–22].

Thereafter, the Superintendent of the West Feliciana School District—a client of A+PEL's—reached out to Britt asking if she would give the same presentation to the West Feliciana School District leadership team.[78] Moreover, an administrator for the Washington Parish Schools—another client of A+PEL's—emailed EDU20/20 for its services and mentioned the presentations at the Teacher Leader Summit.[79] Finally, an LDOE representative emailed Britt at her A+PEL email address inquiring about contracting for training.[80] While Britt forwarded this information to Dumas, she did not tell Courville about this business opportunity.[81]

To further support its claim for damages, Plaintiff points to the cost of the hotel room at the Teacher Leader Summit, the paid personal days wherein Britt promoted EDU20/20, and a presentation in July 2021 at the Catahoula Leadership Academy.[82]

**i. Monetary Relief**

When there is a violation of the Lanham Act, the statute allows for the plaintiff, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the Plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). It further specifies that when "assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Id.* This feature of the Lanham Act runs into the confusion endemic to the merger of law and equity. The Act provides for a monetary remedy—

[78] [Doc. No. 149, p. 16].
[79] [Id. at pp. 8–9].
[80] [Id. at pp. 27–28].
[81] [Id.].
[82] [Id. at pp. 7, 12].

the hallmark of a legal remedy—but it requires courts to do so "subject to the principles of equity." *Id.* In this way, it mirrors the traditional equitable remedy of accounting for profits. The parties use the term "disgorgement," referring to the gain-based equitable remedy. This Court will use the traditional term "accounting for profits" as it more accurately carries with it the ever-important background of the law of equity, something that must accompany this Court's analysis per *Liu v. SEC*, 591 U.S. 71, 78-79, 78–81 (2020).[83] This is where accounting for profits stands in an awkward position in our merged system: though a form of monetary relief, as an equitable remedy, it is for the courts to decide, not juries.

The Fifth Circuit has explained that in determining whether an award of profits under § 1117(a) is appropriate in trademark infringement cases,

> "factors to be considered include, but are not limited to[,] (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."

*Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002).

These factors, often referred to as the *Pebble Beach* factors, will be addressed in turn. Note, again, that when proving a defendant's profits the plaintiff is only required to prove defendant's sales; the defendant must then prove all elements of

[83] *See also* Samuel L. Bray, *Fiduciary Remedies*, in OXFORD HANDBOOK OF FIDUCIARY LAW, (Evan J. Criddle, Paul B. Miller, & Robert H. Sitkoff eds., 2019) ("In addition to causing confusion, the shift [from 'accounting for profits' to 'disgorgement'] means the loss of a profound set of associations.").

costs or deductions attributable to the sales, thus getting to the final net profit amount. 15 U.S.C. § 1117(a).

**a. Whether the Defendant had the Intent to Confuse or Deceive**

When determining liability under the Lanham Act, courts are instructed to consider the digits of confusion, one of which is the defendants' intent to confuse. *See supra*. When determining whether the plaintiff is entitled to the defendants' profits, courts are instructed to consider the *Pebble Beach* factors, one of which is whether the defendant had the intent to confuse. The Fifth Circuit has not explicitly articulated how the analysis under each test differs, if at all. In its most recent case on point, the panel resolved the *Pebble Beach* intent factor by stating "[a]s discussed *supra*" and summarizing its analysis under the digits-of-confusion analysis. This suggests that the analyses are similar. *Trojan Battery*, 175 F.4th at 599.

The Supreme Court's recent opinion in *Romag* is instructive. The Court resolved a circuit split, finding that willfulness is not a precondition for a gain-based equitable remedy under the Lanham Act. *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020). In so doing, the Court noted that, when determining whether an award of profits is appropriate under the Lanham Act, courts should consider the "principle long reflected in equity practice" where "a defendant's mental state, among other factors" is relevant in "choosing a fitting remedy." *Romag*, 590 U.S. at 219. The Court continued, "Given these traditional principles, we do not doubt that a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Id.* This suggests that, given

the equitable nature of the remedy, the court's analysis should be inflected by traditional equitable concerns.

Applied here, the subjective intent of Britt, or to use the language from *Romag*, her "mens rea" is more important than under the *Pebble Beach* analysis. With this background in mind, there is even less to suggest that Britt had the intent to deceive. Even with these equitable considerations at play, the Court encounters the same challenges as before. Much of the malintent that Plaintiff highlights is unrelated to logo use and does not bear on the analysis. Plaintiff's assessment of Britt's intent is often conclusory and speculative but not so much that a reasonable jury could not find that she intended to use the logo "to capitalize on the plaintiff's popularity." *Streamline Prods.*, 851 F.3d at 456. Considering the fact-intensive nature of this factor, the need to make inferences about credibility, and construing all facts in favor of Plaintiff, there is not enough to resolve this factor definitively in the Defendant's direction.

**b. Whether Sales Have Been Diverted**

As Plaintiff rightly notes, diversion of sales is not a prerequisite to an award of an accounting under 15 U.S.C. § 1117(a).[84] Plaintiff explains that its burden is "limited to establishing Defendants' sales . . . because of their violation of 15 U.S.C. § 1125(a)."[85] The alleged violations are limited to Britt's use of A+PEL's logo in the

[84] [Doc. No. 149, p. 18].
[85] [Id. at p. 19].

presentations. Plaintiff points to Defendants' contracts with the Washington Parish School District and the West Feliciana School District.[86]

To support their claim that Defendants "profited from their unlawful, unauthorized use of the A+PEL logo at the 2021 Teacher Leader Summit,"[87] Plaintiff points to an email from McKenzie Skluzacek ("Skluzacek"), the Adolescent Literacy Coach for Washington Parish[88], and a conversation between the superintendent of the West Feliciana School District, Hollis Milton ("Milton"), and Britt.[89] Referring to the "Edu20/20 team," Skluzacek wrote, in pertinent part: "Our ELA coordinator and myself saw several of your sessions at the Teacher Leader Summit and were impressed with your intentional lesson planning and PLC sessions."[90] The undisputed facts also indicate that Milton approached Britt at the Teacher Leader Summit and requested that she present the "Saggy PLCs" presentation at the West Feliciana School District.[91] This Court resolves factual controversies in favor of the nonmoving party—here, A+PEL. As the Fifth Circuit en banc explained, "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). To survive Defendants' Motion for Summary Judgment on damages, this Court would have to take inferential leaps, relieving Plaintiff of its limited

[86] [Doc. No. 79-5, p. 53].
[87] [Doc. No. 149, p. 19].
[88] [Doc. No. 143-1, pp. 6–7].
[89] [Doc. No. 149-5, p. 1].
[90] [Doc. No. 149-5, p. 1].
[91] [Doc. No. 143-1, pp. 6–7].

obligation to supply a factual trail linking these sales with Britt's logo use. This Court declines to do so.

Plaintiff's claim, in essence, is that but for Britt's use of the logo, the subsequent contracts that went to EDU20/20 would have gone to A+PEL. It is worth breaking out each aspect of the Plaintiff's burden. For the Plaintiff to prevail on this factor, Plaintiff must show that (1) EDU20/20 formed contracts that (2) would otherwise have gone to A+PEL, and (3) it was the confusion caused by the use of A+PEL's logo in the presentations that caused the sales to go to EDU20/20 instead of A+PEL. Construing all facts in favor of Plaintiff, the causal chain is too attenuated to support a claim for damages. Indeed, beyond conclusory assertions, Plaintiff does not show exactly how the *logo* caused these sales to be diverted. It is plausible, though not formally considered here, that but for Britt's misrepresentations the contracts may not have been made. However, it strains credulity to maintain that it was the confusion around the use of A+PEL's logo—one icon amongst many on one slide in a slide deck—that led to the defendants' sales.

In sum, while the Plaintiff points to potential customers that were diverted, the record does not support a finding that the sales were tied to the logo infringement. The subsequent interest that Britt received in services following the TLS could have been from a number of factors: her representations as an employee of A+PEL, her previous connections, Dumas's prior connections, etc. Regardless of the impropriety and apparent duplicity in diverting customers, the record does not support a finding that it was the *logo* that caused the Defendants to make these sales.

### c. The Adequacy of Other Remedies

The third factor, adequacy of other remedies, looks at whether another remedy, such as an injunction, would cure the trademark infringement issues. This factor can be resolved in favor of Defendants. As will be discussed at length in the injunctive relief section, Plaintiff's evidence of injury—both monetary and otherwise—is conclusory and speculative. In cases where there is no clear injury, if there is a remedy granted, it is an injunction, as opposed to accounting for profits.

### d. Unreasonable Delay

The fourth factor considers whether there is any unreasonable delay by the Plaintiff in asserting its rights. The Court finds that this factor does not clearly favor either side. On the one hand, the first complaint was filed on October 16, 2022. It was not until the second amended and restated complaint, filed on May 10, 2024, that Plaintiff added the Lanham Act claim. It is this gap of nearly three years from violation to filing that Defendants contend supports their argument of unreasonable delay. On the other hand, much of the behavior that gave rise to this lawsuit occurred in 2021 and was done, as Plaintiff says, "surreptitiously."[92] Britt was less than forthcoming about her involvement with EDU20/20. Evidence that Plaintiff was unaware of the events giving rise to this suit until well after they transpired is found in the undisputed fact that, though Britt resigned from her position at A+PEL at the

---

[92] [Doc. No. 149, p. 16].

end of 2021, Courville kept her on a contract basis through March of the following year.[93]

There is no clear demarcation for what constitutes a "delay," let alone an "unreasonable delay." District courts in the circuit have found a four-month delay from learning of the violation to filing an action reasonable. *Pengu Swim Sch., LLC v. Blue Legend, LLC*, No. 4:21-CV-1525, 2023 WL 5598996, at *8 (S.D. Tex. Aug. 29, 2023). Another court found a five-month delay reasonable. *Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 620 (S.D. Tex. 2014). Conversely, another district court noted that the parties could point to "no case concluding that a one-year delay in filing is unreasonable" but held that "[w]hether such a delay is unreasonable is a question for the jury." no case concluding that a one-year delay in filing is unreasonable. *Modulus Fin. Eng'g, Inc. v. NVIDIA Corp.,* No. 1:24-CV-00362-RP, 2026 WL 2752941, at *16 (W.D. Tex. Aug. 11, 2026), *report and recommendation adopted sub nom. Modulus Financial Engineering, Inc., v. NVIDIA Corp.*, No. 1:24-CV-362-RP, 2026 WL 2751685 (W.D. Tex. Sept. 16, 2026).

Likewise, here there is not enough to definitively resolve this factor. While there is a three-year gap between violation and filing, it is not clear when Plaintiff learned the relevant facts leading to the Lanham Act claim. Finally, this Court is cognizant that the Federal Rules of Civil Procedure and the structure of discovery countenance the fact that a party will discover facts that give rise to a claim not in

[93] [Doc. No. 41, ¶ 66].

the original complaint. If this Court embraced an expansive concept of the delay factor, it would undermine the purposes of our discovery process.

**e. The Public Interest**

The fifth factor, the public interest in making the misconduct unprofitable, is similarly at an equilibrium. Oftentimes, putative infringers argue in favor of the public good of competition. In response, markholders argue that a stated purpose of the Lanham Act is to protect consumers and there remains a strong value in deterring marketplace deception. This is not a case where the product or service is particularly integral to public health, safety, or welfare.

The briefing is limited on this factor. The Court cannot definitively resolve it toward a particular party. To assess whether awarding profits would infringe on competition to the detriment of the public interest or whether it is needed to deter deception turns, in large part, on the Defendants' intent, a factor that, as noted above, also cannot be resolved in either party's favor.

**f. Palming Off**

Palming off occurs when one misrepresents one's own services as the markholder's. *See Retractable Techs*, Inc. *v. Becton Dickinson & Co.*, 919 F.3d 869, 881 (5th Cir. 2019); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003). This is inapplicable. Admittedly, Plaintiff's claims are nebulous on this point, and it is not helped by the fact that it listed but did not apply the *Pebble Beach* factors. If anything, Plaintiff would want *more* attribution to A+PEL. It is the co-opting of the presentation time away from A+PEL that is the Plaintiff's underlying complaint, not that Britt falsely attributed the presentation to A+PEL.

#### g. Summary of the *Pebble Beach* Factors

As the Fifth Circuit has repeatedly said, "a markholder is only entitled to those profits attributable to the unlawful use of its mark." *Quick Techs.*, 313 F.3d at 350. A finding of liability does not invariably lead to an award of profits. In fact, "the Lanham Act[] expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement". *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931, 935 (5th Cir. 1982). Of the six *Pebble Beach* factors, none were resolved in favor of Plaintiff. Three factors—sale diversion, adequacy of other remedies, and palming off—favor Defendants. In affirming the lower court's denial of an accounting of profits, the *Pebble Beach* court stated, "[t]here were no diverted sales nor palming off in this case, which are both significant factors." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998) (citing *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992)). The same is true here. As such, considering only the undisputed factors and resolving all inferences in favor of Plaintiff, Plaintiff is not entitled to an accounting for profits as a matter of law.

### ii. Injunctive Relief

Plaintiff moved only for partial summary judgment on liability under the Lanham Act. Defendants moved for summary judgment. Courts assess injunctive relief with reference to the traditional four-part test:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Traditionally, a plaintiff seeking an injunction under this test must affirmatively prove each element. In 2020, Congress provided a particular rule for cases arising under the Lanham Act. Specifically, in the Trademark Modernization Act of 2020, Congress codified a rebuttable presumption of irreparable harm. 15 U.S.C. § 1116(a). Since the Court found that Defendants' infringed Plaintiff's trademark, Plaintiff is entitled to the presumption. *Id.*

Much of this analysis rests on voluntary cessation. Plaintiff argues that Defendants' "bare assurance[]" that they will not engage in further violations is not enough to preclude injunctive relief.[94] In so doing, Plaintiff cites from a plethora of cases to establish the "heavy" and "formidable" burden that the Defendants must overcome to show that the challenged conduct will not recur.[95] Plaintiff makes an analytical misstep: voluntary cessation for purposes of Article III jurisdiction is different than voluntary cessation for purposes of whether injunctive relief is proper. The cases cited for support relate to the former, which have limited applicability to whether this Court, exercising its equitable powers, should issue a permanent injunction.

The presumption of irreparable injury does not mean that a finding of irreparable is automatic. Indeed, as explained at length in the monetary damages section, beyond Plaintiff's conclusory assertions, there is no evidence of injury stemming from the logo use. The theories of sale diversion are speculative at best,

---

[94] [Doc. No. 149, p. 21].
[95] [Id.].

and Plaintiff has not argued that Defendants' logo use devalued or tainted its brand. Plaintiff has likely eschewed arguments about damage to its brand reputation or good will because it would be in tension with its sale diversion argument. The latter argument rests on the compelling nature of Britt's presentation, which is irreconcilable with the former argument. Even if Plaintiff argued that there was an actionable loss of control of the logo, the structural conditions that gave rise to the conduct—Britt's concurrent employment with A+PEL and EDU20/20—have ceased to exist. With this gone, there is nothing left for the Court to enjoin. With no colorable argument for injury—monetary or otherwise—the Defendants have overcome the presumption of irreparable injury.

The other *eBay* factors do not markedly shift the analysis. The monitoring costs on the Plaintiff are minimal but the compliance costs that Defendants would have to bear if an injunction were issued. The Fifth Circuit has noted that a key aspect favoring injunctive relief is customer confusion. *See, e.g.*, *Whirlpool Corporation v. Shenzhen Sanlida Electrical Technology Co.*, 80 F.4th 536, 546 (5th Cir. 2023) ("Finally the public interest is served by the injunction because enforcement of trademark laws prevents customer confusion") (quoting Eli Lilly & Co. v. Nat. Answers, Inc., 233 F.3d 456, 469 (7th Cir. 2000)). Here, the conditions giving rise to the customer confusion—Britt's concurrent employment with A+PEL and EDU20/20—do not exist. Without these conditions, customer confusion—the central facet of the public interest that would cut toward Plaintiff—is unlikely. Finally, the lack of remedies available at law does not alone lead this Court to issue the

"extraordinary remedy" of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

In sum, the Court finds that Defendants violated the Lanham Act, but that Plaintiff is not entitled to either monetary damages or injunctive relief. Plaintiff's pyrrhic victory reflects the strange, though not uncommon, reality with Lanham Act violations and is driven, in large part, by the inability of Plaintiff to show any diversion of sales resulting from Defendants' use of the A+PEL logo.

**B. State Law Claims**

This Court only has jurisdiction over the Plaintiff's state law claims by virtue of supplemental jurisdiction. 28 U.S.C. § 1367. District courts "may decline to exercise supplemental jurisdiction over a claim" if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction" or "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(2)–(3). This Court has resolved the only claim supplying original jurisdiction. Furthermore, as noted above, Defendants' logo use was not at the core of Plaintiff's allegations, as evidenced by the fact that this suit lasted nearly two years before the Lanham Act claim was added. The LUTPA and fiduciary duty claims involve quintessentially state law issues. With the Lanham Act claim dismissed, it would be improper for this Court to continue to exercise jurisdiction over these state law claims. Thus, this Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## IV. Conclusion

For the reasons set forth above,

**IT IS ORDERED, ADJUDGED, AND DECREED** that EDU20/20, Courtney Dumas, and Miranda Britt's Motion for Summary Judgment [Doc. No. 143] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the Motion [Doc. No. 143] is **DENIED** as to liability under the Lanham Act.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Motion [Doc. No. 143] is **GRANTED** as to damages under the Lanham Act.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Associated Professional Educators of Louisiana's Motion for Partial Summary Judgment on liability under the Lanham Act [Doc. No. 151] is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Plaintiff's remaining LUTPA, Breach of Fiduciary Duty, and Civil Conspiracy claims are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

MONROE, LOUISIANA, this 14th day of October, 2026.

Terry A. Doughty
United States District Judge